# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 44914

SAFARIS UNLIMITED, LLC, a Georgia limited liability company,

        Plaintiff-Respondent-Cross Appellant,

v.

MIKE VON JONES,

        Defendant-Appellant-Cross Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Rexburg, May 2018 Term

Filed: June 29, 2018

Karel A. Lehrman, Clerk

---

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Twin Falls County. Hon. Randy J. Stoker, District Judge.

District court decision following jury trial, <u>affirmed</u> in part, <u>vacated</u> in part and <u>remanded.</u>

Williams, Meservy & Lothspeich, LLP, Jerome, for appellant. Theodore R. Larsen argued.

Worst, Fitzgerald & Stover, PLLC, Twin Falls, for respondent. David W. Gadd argued.

---

BURDICK, Chief Justice.

This appeal comes from the Twin Falls County district court. In January 2017, a jury in that court found that an enforceable contract bound Mike Von Jones to pay Safaris Unlimited, LLC, (Safaris) $26,040 for a 2012 big game hunt Jones went on in Zimbabwe, Africa (2012 hunt). After the jury's verdict, Safaris was awarded attorney fees plus interest on the judgment, bringing the judgment against Jones to $122,984.82. Safaris obtained a writ of execution in June 2017 and attended the sheriff sale as the only bidder. At the sale, Safaris purchased a pending lawsuit arising from Jones's business venture by making a $2,500 credit bid. Jones was later successful in moving to vacate the sale.

1

Jones appeals three issues from the jury trial: (1) the admission of a handwriting exemplar; (2) certain statements made by the district court concerning the handwriting exemplar; and (3) a jury instruction on agency law. Safaris cross appeals the district court's decision to vacate the sheriff sale. For the reasons below, we affirm in part, vacate in part, and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case comes to this Court on appeal for the second time. In July 2015, we reversed the district court's order granting summary judgment to Safaris after concluding triable issues of fact surrounded whether an enforceable contract bound Jones to pay Safaris for the 2012 hunt. *Safaris Unlimited, LLC v. Von Jones* (*Safaris I*), 158 Idaho 846, 850–51, 353 P.3d 108, 1084–85 (2015). In seeking to establish the existence of an enforceable contract, Safaris pointed to an invoice for the 2012 hunt that Jones purportedly signed, but this Court rejected that argument. *Id.* As we explained in *Safaris I*, "the purported signature of Jones at the bottom of an invoice is not sufficient to show any kind of contract between Jones and Safaris Unlimited for the 2012 hunt." *Id.* at 851, 353 P.3d at 1085.

On remand, a three-day jury trial was held in January 2017. Safaris called three witnesses. Jones testified as the only witness in his defense. Jones testified, as relevant here, that a hunting application and an invoice for the 2012 hunt did not contain his authentic signature. Jones's testimony contradicted the testimony of Safaris's witnesses. As such, Safaris moved to admit a handwriting exemplar, exhibit 40, so as to allow the jury to determine whether the hunting application and invoice for the 2012 hunt contained Jones's authentic signature. Outside the jury's presence, Jones initially admitted exhibit 40 contained his authentic signature. But when later questioned in front of the jury about his signature on exhibit 40, he equivocated and hedged his testimony when Safaris's counsel began laying a foundation for its admission. Jones's equivocation prompted the district court to intervene by instructing Jones to give a "yes-or-no answer" to whether exhibit 40 contained his authentic signature. Jones eventually confirmed that exhibit 40 contained his authentic signature, and it was admitted into evidence.

After the district court charged the jury, the jury deliberated for approximately 81 minutes before reaching a unanimous verdict in Safaris's favor. The jury found that an enforceable contract existed between Jones and Safaris to bind Jones to pay Safaris $26,040 for the 2012 hunt. The district court thus entered judgment in Safaris's favor on January 17, 2017,

and later amended that judgment by awarding Safaris interest and attorney fees on April 17, 2017. Under the amended judgment, Safaris was awarded $122,984.82.

By June 2017, Safaris had collected $287.01 on the judgment against Jones. Safaris petitioned for and obtained a writ of execution. The writ of execution, issued on June 2, 2017, reads in relevant part:

> NOW, THEREFORE, you, the Sheriff, are hereby required to satisfy said Judgment, including accrued interest, out of the personal and real property of Mike Von Jones, including,
>
> > without limitation, all right, title, claim, and interest of Defendant Mike Von Jones in and to all claims, demands, damages, debts, liabilities, accounts, reckonings, obligations, bonds, guarantees, warranties, costs, expenses, losses, liens, actions, and causes of action of each and every kind, nature and description, whether now known or unknown, suspected or unsuspected, which Jones might have, own, or hold, or at any time heretofore ever had, owned, or held against Jeremy Sligar and/or Overtime Garage, LLC, including, without limitation, those claims that are the subject of the lawsuit of *Mike Jones v. Jeremy Sligar and Overtime Garage, LLC*; Twin Falls County Case No. CV42-16-1554, [(the *Sligar* litigation[1])] and any and all proceeds thereon,
>
> and make return of this Writ within twenty (20) days after receipt hereof, entering that which you have done thereon.

The sheriff sale was conducted as scheduled, and Safaris, the only bidder in attendance, purchased the *Sligar* litigation by making a $2,500 credit bid. Jones did not attend the sale. Jones, however, was successful in moving to vacate the sale.

Jones timely appeals the admission of exhibit 40 as a handwriting exemplar, statements made by the district court concerning exhibit 40, and a jury instruction concerning agency law. Safaris timely cross appeals the district court's decision to vacate the sheriff sale.

## II. ISSUES ON APPEAL

1. Did the district court abuse its discretion by admitting exhibit 40 as a handwriting exemplar?

2. Did the district court violate Jones's procedural due process rights by instructing Jones to answer whether he signed exhibit 40?

---

[1] In May 2016, Jones filed the *Sligar* litigation in the Twin Falls County district court to assert claims against Jeremy Sligar and Sligar's single-member LLC, Overtime Garage, with whom Jones had allegedly formed a joint business venture. Jones alleged several claims in the *Sligar* litigation, including claims for breach of fiduciary duties, fraud, misappropriation, embezzlement, and unjust enrichment. Unliquidated damages were alleged. Sligar and Overtime Garage counterclaimed several claims against Jones alleging unliquidated damages.

3.      Did the district court err by giving jury instruction 13?

4.      Did the district court abuse its discretion by setting aside the sheriff sale?

5.      Should attorney fees be awarded on appeal?

## III. ANALYSIS

**A.    The district court did not abuse its discretion by admitting exhibit 40 as a handwriting exemplar.**

Jones contends the district court abused its discretion by admitting exhibit 40 as a handwriting exemplar after Jones disputed whether the signatures on exhibits 34 and 35 were authentic.[2] Exhibit 34 is the invoice for the 2012 hunt that Jones purportedly signed. Exhibit 35 is a hunting application for the 2012 hunt that Jones purportedly signed. Exhibit 40 is a temporary protective order that was entered in the *Sligar* litigation, but all contents, less Jones's signature, were redacted. Exhibit 40 was therefore offered and admitted for the limited purpose of allowing the jury to compare Jones's signatures on exhibits 34, 35, and 40 to determine whether the signatures on exhibits 34 and 35 were authentic.

Jones contends the district court erred by admitting exhibit 40 into evidence as a handwriting exemplar, and therefore, "[v]acation of the jury verdict and remand for a new trial is required." Idaho Rule of Evidence 901(b)(3) specifically authorizes handwriting comparisons to be performed "by the trier of fact or by expert witnesses with specimens which have been

---

[2] Additionally, Jones disputed whether the signatures on exhibits 38 and 39 were authentic. While Jones states in his opening brief that "[e]xhibits 38 and 39 were admitted without objection[,]"the transcript shows otherwise. Exhibits 38 and 39, along with exhibit 40, were offered as handwriting exemplars. Exhibit 38, which purports to contain Jones's signature, is Jones's answer filed in this lawsuit. It was admitted after Jones conceded the signature on exhibit 38 "appear[ed] to be [his] signature[,]" even though Jones "d[id]n't know why it ha[d] Mike Von Jones. [He] do[es]n't use that[,]" and Jones stated it "[c]ertainly doesn't look like my signature, it's not anything like the other one, but I can't tell you." Exhibit 39, which purports to contain Jones's notarized signature, is Jones's verified response to Safaris's first set of discovery. Jones acknowledged that "if it's notarized, it probably is [my signature], but certainly is a mess." Exhibit 39 was admitted after the district court recognized that it had been filed with the district court as Jones's response to discovery requests and was

> signed by Mr. Jones. If he is denying that that is his signature, he is estopped from doing that because, in my view, that is not the truth, that is a fraud on this Court, and I will not tolerate it. For that reason, and I'm not making that finding, I'm just saying you don't get it both ways. I find that's sufficient foundation because it was represented to the court system that those were signed interrogatories, so he can deny all he wants, but that's not going to keep this document out.

Given that exhibit 38 was also filed with the district court as Jones's answer, the same logic would apply to exhibit 38. Notably, after the district court pronounced this reasoning, Jones made no further objection to exhibits 38 and 39; nor has he appealed their admission.

authenticated."[3] *Accord* D. Craig Lewis, Idaho Trial Handbook § 21:2 (2d ed. 2017). As an evidentiary decision, the district court's decision to admit exhibit 40 is reviewed for an abuse of discretion. *E.g.*, *Mulford v. Union Pac. R.R.*, 156 Idaho 134, 138, 321 P.3d 684, 688 (2014). To determine whether the district court abused its discretion, this Court evaluates whether the district court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with relevant legal standards; and (4) reached its decision by an exercise of reason. *Lunneborg v. My Fun Life*, slip op. 45200 at p. 7 (June 28, 2018). Jones does not isolate which prong of the abuse of discretion standard he targets. In fact, he does not identify the abuse of discretion standard at all. However, given that Jones contends the admission of exhibit 40 contravenes case law holding that handwriting exemplars are admissible except in "extreme and unusual" circumstances, Jones's argument implicates whether the district court failed to act consistently with relevant legal standards.

In support of Jones's "[e]xtreme and unusual" circumstances argument, he cites to federal case law that posits "extreme and unusual" circumstances involve instances in which "the authenticity of the handwriting is the primary issue in the case, as where forgery is alleged." *United States v. Jenkins*, 785 F.2d 1387, 1395 (9th Cir. 1986). In this case, forgery was never alleged. Further, the authenticity of Jones's signatures on exhibits 34 and 35 was not the primary issue in the case. The primary issue was whether an enforceable contract bound Jones to pay Safaris. The authenticity of Jones's signature on exhibits 34 and 35 is not outcome determinative of that issue. As this Court succinctly explained in *Safaris I*, "the purported signature of Jones at the bottom of an invoice is not sufficient to show any kind of contract between Jones and Safaris Unlimited for the 2012 hunt." 158 Idaho at 851, 353 P.3d at 1085. While Jones refers to the authenticity of his signature on exhibits 34 and 35 as "a central issue," it is clearly not "the primary issue" in this case.

Jones identifies several circumstances that he calls "extreme and unusual." First, Jones contends he had no opportunity to rebut the irrelevant and prejudicial contents of exhibit 40. Below, Jones objected to the admission of exhibit 40 by pointing to "the amount of confusion the jury's going to face . . . . There's so much in that document that has no relation to this case whatsoever. Grossly misleading." Although Jones did not specifically reference Idaho Rule of

---

[3] Effective March 1, 2018, I.R.E. 901(b)(3) was restyled. The rule as restyled, while substantially similar to the pre-amended rule, now authorizes handwriting comparisons "with an authenticated specimen by an expert witness or the trier of fact."

5

Evidence 403, this argument implicates Rule 403, which permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[4] The district court did not agree with Jones that exhibit 40 would confuse or mislead the jury. But the district court did find exhibit 40 implicated another basis of Rule 403—unfair prejudice. The district court thus redacted exhibit 40 so that only Jones's signature on exhibit 40 was submitted to the jury and admonished the jury that exhibit 40 was to be considered for the "limited purpose of . . . considering whether, what Mr. Jones' signature is." By doing so, the district court acted in accord with a cornerstone purpose of the Idaho Rules of Evidence, which is to construe the rules "to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence, *to the end that the truth may be ascertained* and proceedings justly determined."[5] I.R.E. 102 (emphasis added).

But the redaction creates another issue, according to Jones. As he argued below,

the redaction of it makes additional inquiry from me or any recuperation impossible. I want it redacted because it's prejudicial, right? Then the signature, here's the situation, you're presented with a protection order, and you've been through a protection order hearing. Nobody comes out of that hearing feeling great, nobody comes out of those with their wits calm, cool, and collected, to sign a document with the prettiest cursive, [y]our Honor. The fact this is redacted gives me no opportunity to go into that he may have been anxious, that he may have been upset, that he may have been shaking. There may have been factors relating to this document that affected his signature on that date, but we don't redact it, then you've got all the prejudicial evidence, all the prejudicial effect of it. So this document puts me between a rock and a hard place, and it's a catch 22. I feel that there needs to be a record made of that reality that its [sic] creates.

Jones elaborates that the redaction "left Jones with no ability to effectively offer rebuttal testimony. . . . Jones could not explain that his signature was hasty and hurried as he signed the document in a frustrated and emotional state . . . ."

---

[4] Effective March 1, 2018, I.R.E. 403 was restyled. The rule as restyled, while substantially similar to the pre-amended rule, now states: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

[5] Effective March 1, 2018, I.R.E. 102 was restyled. The rule as restyled, while substantially similar to the pre-amended rule, now states: "These rules should be construed so as to administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, to the end of ascertaining the truth and securing a just determination."

We are not persuaded. For one, Jones cites to no legal authority in support of this argument. *State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996) ("A party waives an issue cited on appeal if either authority or argument is lacking, not just if both are lacking."). In addition, Jones's argument is directed at the weight he believes exhibit 40 should have received from the jury, not at admissibility. Jones's argument is therefore improvidently made at this juncture. "Indeed, allowing the court to re-weigh the evidence would infringe upon the parties' right to a jury trial under Article I, sec. 7, of the Idaho Constitution." *Nava v. Rivas-Del Toro*, 151 Idaho 853, 858, 264 P.3d 960, 965 (2011). "It is not our role to reweigh the evidence." *Frontier Dev. Grp., LLC v. Caravella*, 157 Idaho 589, 595, 338 P.3d 1193, 1199 (2014) (quoting *In re Doe 2009-19*, 150 Idaho 201, 209, 245 P.3d 953, 961 (2010)).

Second, Jones takes issue with how exhibit 40 was not disclosed before trial. Jones made this argument below, and the district court properly rejected it. Exhibit 40, which contains Jones's signature dated nine days before trial, was offered to impeach Jones's denial that he signed exhibits 34 and 35. Impeachment evidence need not be disclosed before trial. I.R.C.P. 16(d) ("The court may order the parties to file a list of all trial exhibits and names and addresses of witnesses who may testify, *except impeachment exhibits and witnesses*." (emphasis added)).

Jones's final three contentions—that exhibit 40 was cumulative, came from a case that should have been sealed and inaccessible by Safaris, and inspired improper statements from the district court—were not argued below. Thus, Jones failed to preserve these arguments for appeal. *See, e.g.*, *Obenchain v. McAlvain Constr., Inc.*, 143 Idaho 56, 57, 137 P.3d 443, 444 (2006) ("[A]ppellate courts will not consider new arguments raised for the first time on appeal.").

In sum, the district court did not abuse its discretion by admitting exhibit 40.

**B.     The district court did not violate Jones's procedural due process rights by instructing Jones to answer whether he signed exhibit 40.**

The United States and Idaho Constitutions alike guarantee the right to procedural due process. U.S. Const. amend. XIV; Idaho Const. art. I, § 13. Jones argues the district court violated his procedural due process rights. He isolates and disputes the following colloquy from trial[6]:

> THE COURT: Mr. Jones, do you recognize the signature on Exhibit 40?

---

[6] Jones phrases this issue as concerning the district court's purported "cross-examin[ation]" of Jones. A review of the colloquy, however, shows that the district court did not cross-examine him. *See State v. Hargraves*, 62 Idaho 8, 18, 107 P.2d 854, 858 (1940) ("The purpose of all cross-examination is to weaken or show the untruthfulness of the testimony of the party examined or the party's bias or prejudice."); *accord* I.R.E. 611(b).

7

MR. JONES: It doesn't look like my signature, but if it's -- I don't -- and again, I'm not positive what document it's associated with. So it makes it very difficult for me to ascertain the validity of it. If it's the document that I think that it is, I was in a very precarious position, if I did, indeed, sign this, I signed it.

THE COURT: I just need a yes or no.

MR. JONES: With my hand like this, and I was in a very shaky situation, the circumstances were very shaky. It was not a normal circumstance like I was coming into your office and sitting down. Very extenuating circumstances involved if it's what I think it is. But I don't know what it is.

THE COURT: Mr. Jones, is that your signature on Exhibit 40?

MR. JONES: It didn't look like my signature but could be.

THE COURT: Mr. Jones, I just need a yes or no. Is that your signature?

MR. JONES: I don't know what the document is.

THE COURT: Mr. Jones, the question is very simple. Is that or is that not your signature, yes or no?

THE WITNESS: It --

THE COURT: No, I don't want an explanation. I want a yes-or-no answer to that question.

THE WITNESS: It's not the way I sign it, but it might be.

THE COURT: This is not the question, sir. I want to give you one more opportunity to answer the Court's direct question.

THE WITNESS: Okay.

THE COURT: I'm getting tired of this --

THE WITNESS: I suspect --

THE COURT: Be quiet.

THE WITNESS: Thank you.

THE COURT: Is that or is that not your signature? Yes or no?

THE WITNESS: Yes.

THE COURT: Thank you.

THE WITNESS: If it came off the document I think it did.

. . . .

THE COURT: Need to instruct the jury on something. . . .

Ladies and gentlemen, this document, when you see it is, it is a signature line and date. It is part of another document, okay? We redacted that document because it has things on it that have nothing to do with this case, okay? And in order not to prejudice you about something that has nothing to do with this case, I made the attorneys take the irrelevant stuff off. So what you're looking at is simply a signature and a date, and Mr. Jones' testimony, I'm sorry I got a little rough with you, Mr. Jones, but he's now admitted that's his signature. The purpose of that, counsel will tell you what purposes as they argue this case to you.

According to Jones, the above-recited colloquy signifies a violation of his procedural due process rights. Even though Jones did not make this argument below, *Obenchain*, 143 Idaho at 57, 137 P.3d at 444, and also failed to object below, I.R.E. 614(c), we construe Jones's argument

as attempting to void the judgment. This allows us to review the otherwise unpreserved argument on appeal.

> "[V]oid judgments can be attacked at any time." *Burns v. Baldwin*, 138 Idaho 480, 486, 65 P.3d 502, 508 (2003). Generally, the Court may declare a judgment void only for defects of personal jurisdiction or subject-matter jurisdiction. *Catledge v. Transp. Tire Co.*, 107 Idaho 602, 607, 691 P.2d 1217, 1222 (1984). However, a judgment is also void if the "court's action amounts to a plain usurpation of power constituting a violation of due process." *Dep't of Health and Welfare v. Housel*, 140 Idaho 96, 100, 90 P.3d 321, 325 (2004) (citation omitted).

*Meyers v. Hansen*, 148 Idaho 283, 291, 221 P.3d 81, 89 (2009).

Jones's argument, however, is unpersuasive. Jones has not shown the district court's action "amounts to a plain usurpation of power" that would warrant voiding the judgment. *See id.* (quoting *Housel*, 140 Idaho at 100, 90 P.3d at 325). "[A]mong the inherent powers of the judicial branch is the authority vested in the courts to protect and maintain the dignity and integrity of the court room and to achieve the orderly and expeditious disposition of cases." *Talbot v. Ames Constr.*, 127 Idaho 648, 652, 904 P.2d 560, 564 (1995). Accordingly, this Court has recognized that a trial judge may "speak sharply to secure the attention of [a] witness to the questions and responses thereto." *State v. Glanzman*, 69 Idaho 46, 52, 202 P.2d 407, 410 (1949).

In *Glanzman*, the defendant appealed his driving under the influence of alcohol conviction. *Id.* at 47, 202 P.2d at 408. He argued in part that the trial judge had prejudiced him by remarking in the jury's presence: (1) "Just a minute. You answer the questions"; (2) "I want you to answer the questions without any argument"; (3) "Do you want to go upstairs for contempt of Court? Now answer the questions"; (4) "And without any argument"; (5) "Answer the question. I am not going to tell you again"; and (6) "I said answer the questions. I am not going to tell you again about this argument." *Id.* at 52–53, 202 P.2d at 410–11. In concluding these remarks did not illustrate prejudice, *Glanzman* reasoned:

> The text of the remarks by the court (criticized by appellant) clearly show he was merely attempting to get appellant, when on the witness stand, to answer the questions without circumlocution and while it is better for the trial court not to thereten [sic] the defendant with disciplinary proceedings in the presence of the jury, the attitude of appellant, apparent to the learned trial judge and perforce not to us, may have indicated it was necessary to speak sharply to secure the attention of witness to the questions and responses thereto. In one instance appellant's own counsel had to admonish the appellant to answer the question.

*Id.* at 52, 202 P.2d at 410. As in *Glanzman*, the district court instructed Jones to answer the question forthrightly. This did not prejudice Jones. It is not as if the district court expressed an

opinion on the weight or credibility of evidence. *State v. Yakovac*, 145 Idaho 437, 442, 180 P.3d 476, 481 (2008) ("Prejudicial remarks are those that constitute a comment on the weight of the evidence."). In fact, throughout the trial, the district court repeatedly admonished the jury to not form any opinions or have any discussions about the case until the evidence was fully submitted. This Court presumes the jury follows the district court's instructions, *State v. Joy*, 155 Idaho 1, 7, 304 P.3d 276, 282 (2013), and Jones has not overcome this presumption.

Even so, Jones cites to two cases from other jurisdictions to argue that "the trial court must refrain from casting any doubt on the credibility of the witness or claims made by a party." While Jones correctly iterates the rule pronounced in these two cases, neither case assists Jones. The first case is *Livant v. Adams*, 17 A.D.2d 784, 784 (N.Y. App. Div. 1962), where the New York Supreme Court explained, without significant analysis, that:

> the conduct of the trial court justifiably created the impression for counsel and the jury, and in the record, of the Judge's disbelief in the defense interposed by defendant-appellant. Inevitably a trial court sets the pattern for the jury. The brief but derogatory cross-examination by the court of defendant-appellant and, perhaps, of one of this defendant's witnesses, openly evinced disbelief in the testimony. (The trial court's comments to appellant's counsel at the conclusion of the trial confirmed the existence of pique at counsel's failure to settle the case on terms recommended by the court.) The trial, therefore, was not fair.

The second case is *State Highway Comm'n v. Kenan Oil Co.*, 131 S.E.2d 665, 665 (N.C. 1963), a takings case. There, the North Carolina State Highway Commission (NCSHC) widened a roadway and, in doing so, took a portion of Kenan Oil's land. *Id.* NCSHC awarded Kenan Oil $12,700 as just compensation for the taking. *Id.* Kenan Oil "alleged that the value of the land taken and the damage to the remaining property amounted to $45,000.00." *Id.* During a jury trial and in the jury's presence, the trial court remarked the following about Kenan Oil's president,

> you would take in consideration his natural interest in the outcome of this, because after all he was the owner of the property. When I say 'he', he is president of the corporation which owns the property and (there may be specific values in his mind which the real estate appraisers will not consider).

*Id.* at 666. The North Carolina Supreme Court concluded that the above remark "was an inadvertent expression of opinion indicating that the judge questioned either the credibility or judgment of defendant's witness[.]" *Id.* As the *Kenan Oil* court further explained, "the able and conscientious trial judge meant to be stating a contention of the defendant. However, the jurors were nowhere so informed and they undoubtedly interpreted the statement . . . to mean that the judge thought Kenan's evaluation of the damage too high." *Id.*

*Livant* and *Kenan Oil* illustrate no error in this case. *Livant*, while analytically sparse, emphasized that the trial judge "openly evinced disbelief in the testimony." 17 A.D.2d at 784. *Kenan Oil* turned on an opinion as to the "credibility or judgment of defendant's witness" and damages evaluation the trial judge inadvertently expressed. 131 S.E.2d at 666. Here, the district court did not evince disbelief like in *Livant*. At most, the transcript shows the district court evinced frustration and a desire for Jones to answer the question, but not disbelief. Nor did the district court express an opinion on Jones's credibility like in *Kenan Oil*. The district court only instructed Jones to answer the question—which he had previously answered in the affirmative outside the jury's presence—with a yes-or-no response in front of the jury. The district court did not even intimate which answer Jones had previously given.

The disputed colloquy does not signify a violation of Jones's procedural due process rights. Instead, the colloquy signifies the district court's proper exercise of its inherent power to "protect and maintain the dignity and integrity of the court room and to achieve the orderly and expeditious disposition of cases." *Talbot*, 127 Idaho at 652, 904 P.2d at 564; *accord Cardoza v. Cardoza*, 76 Idaho 347, 350, 282 P.2d 475, 476 (1955) ("A trial judge is vested with broad discretionary powers in the conduct and during progress of a trial. His exercise of that discretion will not be disturbed unless abused or material harm be done to the complaining party.").

**C.      We decline to address whether the district court erred by giving jury instruction 13.**

We do not reach the merits of Jones's argument that the district court erred by giving jury instruction 13 since Jones failed to object to the instruction below. As Idaho Rule of Procedure 51(i)(3) provides, "[n]o party may assign as error the giving of or failure to give an instruction unless the party objects before the jury deliberates, stating distinctly the instruction to which that party objects and the grounds of the objection." *Accord Obenchain*, 143 Idaho at 57, 137 P.3d at 444 ("[A]ppellate courts will not consider new arguments raised for the first time on appeal."). "The plain language of the Rule is clear in that it requires a party object to a jury instruction before the jury retires to consider its verdict." *Bates v. Seldin*, 146 Idaho 772, 775, 203 P.3d 702, 705 (2009). Since Jones made no objection, we decline to further address the argument.

**D.      We vacate the district court's decision to set aside the sheriff sale.**

Safaris cross appeals the district court's decision to set aside the execution sale. "Whether to set aside an execution sale lies largely within the trial court's discretion." *Suchan v. Suchan*, 113 Idaho 102, 109, 741 P.2d 1289, 1296 (1986). As noted, to determine whether the district

court abused its discretion, this Court evaluates whether the district court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with relevant legal standards; and (4) reached its decision by an exercise of reason. *Lunneborg v. My Fun Life*, slip op. 45200 at p. 7 (June 28, 2018). Safaris expressly targets its arguments to the prongs asking whether the district court acted within the outer boundaries of its discretion, acted consistently with the relevant legal standards, and reached its decision by an exercise of reason.

Title 11 of the Idaho Code enumerates the particular requirements governing sheriff sales. The requirements of Title 11 evince the twin aims of compensating the judgment creditor while simultaneously protecting the judgment debtor from overreaching. For example, Title 11 permits the judgment creditor to execute on all non-exempt personal and real property of the judgment debtor, I.C. § 11-201, requires any sale proceeds exceeding the amount of the judgment to be returned to the judgment debtor, I.C. § 11-301, sets forth detailed notice requirements, I.C. § 11-302, articulates strict conduct-of-sale requirements, I.C. § 11-304, and provides a statutory right of redemption, I.C. §§ 11-310, 11-410. Sheriff sales, once conducted, are not immune from a collateral attack, as the sale may be set aside. The "general rule" that governs whether a sheriff's sale should be vacated is as follows: "mere inadequacy of consideration is not sufficient ground for setting aside a sheriff's sale, but it is uniformly held that gross inadequacy of consideration, coupled with very slight additional circumstances, is sufficient." *Fed. Land Bank of Spokane v. Curts*, 45 Idaho 414, 425, 262 P. 877, 880 (1927).

We have applied the above-stated general rule on several occasions. In *Curts*, this general rule was applied to vacate the sale when real property was erroneously subdivided and sold for $300, despite that a written bid for $8,700 had been submitted. *Id.* at 421–22, 425, 262 P. at 879, 881. Similarly, in *Gaskill v. Neal*, 77 Idaho 428, 432, 293 P.2d 957, 960 (1956), this general rule was applied to vacate the sale when a house and garage, worth $11,000, were erroneously segregated and sold as two distinct units for a mere $426.12. And in *Tudor Engineering Co. v. Mouw*, 109 Idaho 573, 575–76, 709 P.2d 146, 148–49 (1985), this general rule was applied to vacate the sale when interested parties received no notice of the sale, at which real property was sold for $385.65 and shortly thereafter advertised for a subsequent sale by the purchaser for $49,000. In *Curts*, *Neal*, and *Tudor*, gross inadequacy of consideration was coupled with "slight additional circumstances," *i.e.*, the erroneous division of real property, *Curts*, 45 Idaho at 421–

12

22, 425, 262 P. at 879, 881; *Neal*, 77 Idaho at 432, 293 P.2d at 960, and failure to comply with constitutional and statutory requirements pertaining to notice of the sale, *Tudor*, 109 Idaho at 575–76, 709 P.2d at 148–49, making it proper to set aside the sales. Each case shared one similar fact—the party harmed by the grossly inadequate sale price and attendant additional circumstances was the judgment debtor. *Phillips v. Blazier-Henry*, 154 Idaho 724, 729, 302 P.3d 349, 354 (2013) (referring to *Curts*, *Neal*, and *Tudor* to observe that the cases "had one additional fact in common—they were all cases in which the party injured by the grossly inadequate sale price and additional circumstance was the judgment debtor").

By contrast, we applied this general rule to reject the judgment creditor's argument that the sale should be vacated in *Suchan*, 113 Idaho 102, 741 P.2d 1289.

> *Suchan* was a case where the judgment creditor sought relief for an alleged inadequate sale price. The judgment creditor levied on the judgment debtor's property for satisfaction of a debt in the amount of $100,000, plus interest. [*Id.*] at 108, 741 P.2d at 1295. A purchaser bought 800 acres of the real property levied upon for $12,000, assuming a mortgage in the amount of $59,000, for an effective price of $71,000. *Id.* at 110, 741 P.2d at 1297. The Court noted that the property had been appraised at $680,000, but evidence at the time of sale placed the value at $300,090. *Id.* The Court said that the low sale price was affected by water permit problems, a depressed market price for farm land, rock outcrops, the potential for further lien claims by the judgment creditor, and "the fact forced sales commonly produce low prices." *Id.* The *Suchan* Court did not find that the sale price was grossly inadequate but, more relevant to this case, found there was no irregularity in the sale. *Id.* The Court indicated that the judgment creditor's "misunderstanding of her legal rights, though unfortunate, is not an irregularity in the sale itself." *Id.* at 109, 741 P.2d at 1296. The Court also noted that, "[b]y [the judgment creditor's] failure to bid the $100,000 plus interest, [she] did not preserve her judgment lien for this amount." *Id.* at 108, 741 P.2d at 1295.

*Phillips*, 154 Idaho at 729, 302 P.3d at 354 (citing *Suchan*, 113 Idaho at 108–10, 741 P.2d at 1295–97).

More recently, in *Phillips*, we reiterated the general rule and clarified that gross inadequacy of consideration alone is not sufficient to set aside the sale. In *Phillips*, the sheriff sold approximately 20 acres of land for $1,000. *Id.* The district court vacated the sale after concluding the price was so low as to "shock the judicial conscience," but noted that no "slight additional circumstances" attended the grossly inadequate consideration. *Id.* at 728, 302 P.3d at 353. When *Phillips* came before this Court on appeal, we reversed and reaffirmed that vacating the sale requires both grossly inadequate consideration and attendant "additional circumstance[s.]" *Id.* at 728–30, 302 P.3d at 353–55. *Phillips* rejected the judgment creditors'

13

arguments advocating for this Court to adopt a "shock the conscience" standard, as that standard ignored the requirement of attendant additional circumstances. *Id. Phillips* further rejected the judgment creditors' alternative arguments that sufficient additional circumstances attended the grossly inadequate consideration. *Id.* at 729–30, 302 P.3d at 354–55. The only additional circumstances the judgment creditors could identify were their failures to: (1) attend the sale and submit a credit bid; (2) clearly instruct the sheriff to enter a credit bid on their behalf; and (3) take efforts to obtain an assignment of the debtor's redemption right. *Id.* Distilled, these additional circumstances only illustrated the judgment creditors' inattention and misunderstanding of the law, causing this Court to conclude the district court erred by setting aside the sheriff sale. *Id.*

Applying the general rule here leads us to vacate the district court's decision setting aside the sheriff sale. At the outset, we clarify that no bright-line rule precludes executing on unliquidated claims. In fact, just the opposite is true. Idaho Code section 11-201 broadly provides in relevant part:

> All goods, chattels, moneys and other property, both real and personal, or any interest therein of the judgment debtor, not exempt by law or by court order, and all property and rights of property, seized and held under attachment in the action, are liable to execution. Shares and interest in any corporation or company, and debts and credits, and all other property both real and personal, or any interest in either real or personal property, and all other property not capable of manual delivery, may be attached on execution in like manner as upon writs of attachment.

Idaho Code section 11-301 is similarly expansive and states in relevant part:

> The sheriff must execute the writ against the property of the judgment debtor by levying on a sufficient amount of property if there be sufficient; collecting or selling the things in action, and selling the other property, and paying to the plaintiff or his attorney so much of the proceeds as will satisfy the judgment.

Accordingly, Title 11 does not differentiate between liquidated and unliquidated claims; nor does Title 11 preclude executing on unliquidated claims.[7]

---

[7] We need not look to unliquidated-claim considerations placed at issue in *Snow, Nuffer, Engstrom & Drake v. Tanasse*, 980 P.2d 208, 210–11 (Utah 1999), cited by Jones. That case held that a law firm's actions of "forcing an execution sale . . . to satisfy a default judgment, purchasing [a] pending legal malpractice claim against it, and extinguishing that claim through a motion to dismiss—violate[d] public policy." *Id.* at 211. Because this case presents nothing similar, those considerations are best left for another day.

Nonetheless, we reach this result because the district court failed to act consistently with relevant standards by not conducting a proper application of the governing law. The district court specifically failed to make a sufficient finding as to the approximate value of the *Sligar* litigation. To be sure, the district court did observe that the *Sligar* litigation "appear[ed] to be a many hundred thousand dollar potential lawsuit[.]" Still, the district court later remarked that "[i]t may be that Mr. Sligar owes Mr. Jones some money, it may be that Mr. Jones owes Mr. Sligar some money, it may be that neither one of them owes anybody any money. Who knows?" The district court thus did not make a sufficient finding on the *Sligar* litigation's approximate value. This finding was critical, as the governing law very clearly inquires whether "gross inadequacy of consideration . . . [is] coupled with very slight additional circumstances[.]" *Curts*, 45 Idaho at 425, 262 P. at 880; *accord Phillips*, 154 Idaho at 727–30, 302 P.3d at 352–55; *Tudor*, 109 Idaho at 575–76, 709 P.2d at 148–49; *Gaskill*, 77 Idaho at 432–33, 293 P.2d at 960. The absence of such a finding leaves us unable to conduct a proper appellate review, given that we do not find facts on appeal. *See, e.g.*, *Frontier Dev. Grp., LLC v. Caravella*, 157 Idaho 589, 595, 338 P.3d 1193, 1199 (2014) ("Because this Court does not act as a trier of fact, we may not, for the first time on appeal, find that the Caravellas have proven all nine elements of fraud by clear and convincing evidence."); *accord In re City of Shelley*, 151 Idaho 289, 294, 255 P.3d 1175, 1180 (2011).

While Title 11 does not treat unliquidated claims any differently than other non-exempt property, we acknowledge that the district court's failure to make a sufficient finding as to the approximate value of the *Sligar* litigation may be born, at least in part, by the fact that it features unliquidated claims. With this concern in mind, Safaris points to *Citizens National Bank v. Dixieland Forest Products, LLC*, 935 So.2d 1004, 1010 (Miss. 2006), which explains that "[a]s with any other personal property, a chose in action's value—for purposes of levy and execution—is determined at a sheriff's execution sale." Safaris thus urges this Court to "adopt the rule . . . that for purposes of levy and execution, a cause of action's value is determined at a sheriff's execution sale." Under Safaris's approach, since the *Sligar* litigation sold for $2,500, "then that fact alone should be conclusive of the [*Sligar* litigation's] value."

Safaris's reliance on *Dixieland Forest* is unpersuasive. There, the Mississippi Supreme Court explained that the value of a claim is determined at a sheriff sale after looking to Mississippi Code section 11-7-7, which stated that "[a]ny chose in action or any interest therein,

15

after suit has been filed thereon, may be sold or assigned the same as other property, whether such claim or any interest therein was heretofore assignable under the laws of this state or not." *Id.* at 1009 (quoting M.C. § 11-7-7). *Dixieland Forest* also looked to Mississippi Code section 13-3-135, which provided that "[t]he purchaser of any chose in action, stock, share, interest, judgment, or decree of the defendant, sold under execution or attachment, shall become the owner thereof, in the same manner as if it had been regularly assigned to him by the defendant." *Id.* (quoting M.C. § 13-3-135). The Idaho Code, by contrast, does not explicitly permit a chose in action (or any interest therein) to be "sold or assigned *the same as other property*[.]" *Compare* M.C. § 11-7-7 (emphasis added), *with* I.C. §§ 11-201, 11-301. Nor does the Idaho Code contain a statute analogizing the execution and attachment of a chose in action to assignment of a chose in action, as does Mississippi Code section 13-3-135. As such, we decline to adopt *Dixieland Forest*'s conclusion that the value of unliquidated claims is determined by the amount paid at the execution sale.

Contrary to what Safaris has argued, in ascertaining the approximate value of unliquidated assets like the *Sligar* litigation, the district court is not constrained by the price paid at the sheriff sale. Nor is the district court constrained by the parties' bare or unsupported assertions. The district court is instead free to take evidence and to hold a hearing in an effort to determine approximate value, and exactitude is neither required nor feasible. The district court should look to appropriate factors it finds relevant under the circumstances. These factors will vary in each case,[8] but here those factors may include: (1) the amount alleged to be in controversy and whether and to what extent any evidence supports that amount; (2) whether any liquid assets are the subject of the case and their appraised values; (3) the procedural posture of the case, including the status of any dispositive motions; (4) whether, without causing a breach of confidence, it can be ascertained that settlement discussions have been or are likely to be had; and (5) whether a contract or statute makes it likely that attorney fees will be awarded to the

---

[8] For example, in *Suchan*, we wrote as follows:

> While the land had been appraised at the time of the partition order at $680,000, evidence of the value at the time of sale put the value at about $300,090. Several factors could explain the low purchase price: (1) a water permit allowing irrigation of only 480 acres (though 494 acres were irrigated in fact); (2) depressed market prices for farm land; (3) rock outcroppings on the land; (4) the fact [the judgment creditor's] attorney announced prior to the sale of each parcel that it was being sold subject to [the judgment creditor's] continuing lien; and (5) the fact forced sales commonly produce low prices.

113 Idaho at 110, 741 P.2d at 1297.

16

prevailing party. While the finding of approximate value must be clearly articulated, either on the record or in writing, and based on a preponderance of the evidence, it is not our intent that the process for determining approximate value be onerous or inefficient. Indeed, since we recognize that determining approximate value of unliquidated assets will present challenges unique to each case, we will conduct our review with due regard for how the district court exercised its discretion under the circumstances.

Because the district court failed to make a sufficient finding here, and thus failed to act consistently with relevant legal standards, we vacate the district court's decision setting aside the sheriff sale and remand for further proceedings consistent with this opinion. *See, e.g.*, *Rish v. Home Depot, Inc.*, 161 Idaho 702, 706, 390 P.3d 428, 432 (2017) ("Therefore, we vacate and remand for proper application of the governing law . . . ."); *Urry v. Walker & Fox Masonry Contractors*, 115 Idaho 750, 755, 769 P.2d 1122, 1127 (1989) ("[I]f a decision, taken as a whole, appears to reflect a misapprehension of law, the proper appellate response is to vacate the decision and to remand the case for reconsideration in light of the proper legal framework.").

**E.     Should attorney fees be awarded on appeal?**

Based on the above, Safaris prevails on both Jones's appeal and its cross appeal. Safaris, as the prevailing party, requests an award of attorney fees under Idaho Code section 12-120(1). Section 12-120(1) provides:

> Except as provided in subsections (3) and (4) of this section, in any action where the amount pleaded is thirty-five thousand dollars ($35,000) or less, there shall be taxed and allowed to the prevailing party, as part of the costs of the action, a reasonable amount to be fixed by the court as attorney's fees. For the plaintiff to be awarded attorney's fees, for the prosecution of the action, written demand for the payment of such claim must have been made on the defendant not less than ten (10) days before the commencement of the action; provided, that no attorney's fees shall be allowed to the plaintiff if the court finds that the defendant tendered to the plaintiff, prior to the commencement of the action, an amount at least equal to ninety-five percent (95%) of the amount awarded to the plaintiff.

Section 12-120(1) applies in both the trial court and on appeal. *See, e.g.*, *Loftus v. Snake River Sch. Dist.*, 130 Idaho 426, 429, 942 P.2d 550, 553 (1997). Applied here, section 12-120(1) entitles Safaris to attorney fees for responding to Jones's appeal. Safaris, the plaintiff, sued Jones to recover $26,040, and it prevailed both below and in responding to Jones's appeal. Moreover, before suing on June 28, 2013, Safaris served Jones with a pre-suit demand on May 1, 2013,

satisfying section 12-120(1)'s ten-day demand requirement. Thus, Safaris is entitled to attorney fees for responding to Jones's appeal under section 12-120(1).

However, Safaris is not entitled to attorney fees for bringing its cross appeal, even though it has prevailed. In its request for attorney fees, Safaris cites only section 12-120(1). But Safaris's cross appeal concerned the sheriff sale—*i.e.*, Safaris's post-judgment efforts to collect on the judgment. Section 12-120(1) does not govern attorney fees arising from Safaris's cross appeal; rather, section 12-120(5) governs these fees. *See, e.g.*, *Credit Bureau of E. Idaho, Inc. v. Lecheminant*, 149 Idaho 467, 473, 235 P.3d 1188, 1194 (2010). Yet, Safaris never cites to section 12-120(5). "In order to be awarded attorney fees, a party must actually assert the statute or other basis for the award." *KEB Enters., L.P. v. Smedley*, 140 Idaho 746, 754, 101 P.3d 690, 698 (2004). Therefore, Safaris is entitled to attorney fees for responding to Jones's appeal, but not attorney fees for bringing its cross appeal.

## IV. CONCLUSION

We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion. Specifically, as to Jones's appeal, we affirm (1) the admission of exhibit 40; (2) certain statements made by the district court concerning exhibit 40; and (3) jury instruction 13. As to Safaris's cross appeal, we vacate the district court's decision to set aside the sheriff sale and remand for further proceedings consistent with this opinion. We award Safaris attorney fees for responding to Jones's appeal, but not attorney fees for bringing its cross appeal. Costs to Safaris.

Justices HORTON, BEVAN, DUNN, Pro tem and NAFTZ, Pro tem, **CONCUR.**